**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 28, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DAVION L. JEFFERSON,

      Defendant - Appellant.

No. 17-3150

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:15-CR-20012-CM-1)**

_____

Daniel T. Hansmeier, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with him on the briefs), Kansas City, Kansas, for Defendant - Appellant.

Carrie N. Capwell, Assistant United States Attorney (Stephen R. McAllister, United States Attorney, with her on the brief), Kansas City, Kansas, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **O'BRIEN**, and **MATHESON**, Circuit Judges.

_____

**O'BRIEN**, Circuit Judge.

_____

    In a span of eleven days, Davion L. Jefferson committed five robberies. Each was captured by multiple surveillance cameras. The first three robberies occurred on separate

occasions but, strange as it may seem, at the same Fast Trip convenience store. All three involved Jefferson and an unnamed minor male accomplice (hereinafter accomplice). The last two robberies occurred less than two hours apart on the same date but at different locations—a Fast Stop convenience store and a 7-Eleven gas station. Jefferson's cohort during these robberies was Nicholas Lolar. Both Jefferson and Lolar were armed. After these robberies, Jefferson posted "Can't wake up broke" on his Facebook page. (Supp. R. Vol. 1 at 30.) He included a picture of a hand holding a wad of cash and a number of emojis, including a firearm emoji.

Jefferson was indicted with five counts of Hobbs Act robbery (Counts 1-3, 5, and 7) in violation of 18 U.S.C. § 1951(a), (b)(1) and three counts of use and carry of a firearm in violation of 18 U.S.C. § 924(c) (Counts 4, 6, and 8).[1] At trial, he did not dispute his participation in all five robberies but tried to plant seeds of reasonable doubt with the jury as to the § 924(c) counts by suggesting the weapons used during the last two robberies were not actual firearms. Considering the very real possibility of a mandatory 32 years in prison if found to have twice brandished an actual firearm, *see infra* n.2, it was sound trial strategy. The jury, however, was not convinced and he was sentenced to

---

[1] Counts 1-3 pertained to the first three robberies (with the minor accomplice) at the Fast Trip. Count 4 pertained to the use and carry of a firearm during the third robbery. The store clerk testified to Jefferson telling him he had a gun while lifting his shirt to reveal the handle of a weapon in his waist. But the jury acquitted him on that count; we do not discuss it.

Counts 5 and 7 pertained to the last two robberies (with Lolar) at the Fast Stop and 7-Eleven, respectively. Their use of a gun during these robberies resulted in two § 924(c) counts, Counts 6 and 8.

the mandatory 32 years plus a consecutive 70 months for the robberies, for a total sentence of 454 months.[2]

Jefferson changes strategy on appeal. He does not now quarrel with the jury's findings; instead he claims various legal errors. As we explain, his alleged errors are either foreclosed by precedent or harmless.

A. *Counts 6 and 8 - § 924(c) counts*

Section 924(c) calls for increased penalties if a firearm is used or carried "during and in relation to any crime of violence . . . ." 18 U.S.C. § 924(c)(1)(A). Relevant here, the statute defines "crime of violence" as a felony offense having "as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A).[3] This statutory language is often referred to as the

---

[2] The judge imposed a total sentence of 70 months on the robbery counts. He also imposed (1) a mandatory consecutive sentence of 84 months (7 years) on the first § 924(c) count (Count 6), because the jury specifically found Jefferson "brandished" the firearm, *see* 18 U.S.C. § 924(c)(1)(A)(ii), and (2) a mandatory consecutive 300 months (25 years) on the second § 924(c) count (Count 8), *see* 18 U.S.C. § 924(c)(1)(C)(i). (R. Vol. 1 at 269).

[3] Section 924(c)(3) also defines "crime of violence" as a felony offense which "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). This statutory language is known as the risk-of-force or residual clause. In its brief, the government argued even if Hobbs Act robbery is not a "crime of violence" under § 924(c)(3)'s elements clause, it still qualifies as such under the residual clause. However, as it acknowledges in a Rule 28(j) letter, we have since decided § 924(c)(3)'s residual clause—like its counterparts in the Armed Career Criminal Act (ACCA) (18 U.S.C. § 924(e)(2)(B)(ii)) and 18 U.S.C. § 16(b)—is unconstitutionally vague. *See United States v. Salas*, 889 F.3d 681, 686 (10th Cir. 2018) (citing *Sessions v. Dimaya*, —— U.S. ——, 138 S. Ct. 1204 (2018) (§ 16(b)), and *Johnson v. United States (Johnson II)*, —— U.S. —— , 135 S. Ct. 2551 (2015) (§ 924(e)(2)(B)(ii))). For that reason, we ignore § 924(c)(3)'s

force or elements clause (hereinafter elements clause).

The "crime[s] of violence" referred to in the § 924(c) counts (Counts 6 and 8) were the Hobbs Act robberies charged in Counts 5 and 7, respectively. *See supra* n.1. The Hobbs Act robbery statute, 18 U.S.C. § 1951(a), (b)(1), prohibits one from "obstruct[ing], delay[ing] or affect[ing] commerce or the movement of any article or commodity in commerce, by robbery . . . ." 18 U.S.C. § 1951(a). It defines robbery as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property . . . ." 18 U.S.C. § 1951(b)(1).

Prior to trial, Jefferson submitted proposed jury instructions for Counts 6 and 8 which would have required the jury to find (1) he "committed robbery by force capable of causing physical pain or injury to another person or the person's property" as charged in Counts 5 and 7, respectively, and (2) he "knowingly used or carried a firearm . . . during and in relation to [those] robber[ies]." (R. Vol. 1 at 187, 189.) According to him, such an instruction was necessary if the robberies were to qualify as "crime[s] of violence" under § 924(c)(3)(A) because "physical force" in that statute is equivalent to "physical force" as used in the "violent felony" definition in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(i). The Supreme Court defined "physical force" in § 924(e)(2)(B)(i) as "*violent* force—that is, force capable of causing physical pain or

---

residual clause but that does not resolve the matter; Hobbs Act robbery qualifies as a "crime of violence" under the elements clause.

- 4 -

injury to another person." *See United States v. Johnson (Johnson I)*, 559 U.S. 133, 140 (2010).

The judge refused the proposed instructions. Instead, he told the jury (for Counts 6 and 8) the government had to prove beyond a reasonable doubt he (1) "committed the crime of robbery" as charged in Counts 5 and 7, respectively, and (2) "knowingly used or carried a firearm . . . during and in relation to [those] robber[ies]." (R. Vol. 1 at 254-55.) He also told the jury: "robbery is a crime of violence." (*Id*. at 256.) After trial, Jefferson moved for a judgment of acquittal on Counts 6 and 8, again chanting his mantra—Hobbs Act robbery is not a "crime of violence" under § 924(c)(3)(A). The judge denied the motion.

According to Jefferson, the judge was wrong for two reasons. First, Hobbs Act robbery is not a "crime of violence" under § 924(c)(3)(A) because the statute requires the predicate offense have a force <u>element</u> and Hobbs Act robbery has only a force <u>means</u>. Second, even if Hobbs Act robbery has a force element, the judge erred in directing a verdict on that element; he should have instead submitted the issue to the jury. We start with his latter argument.

1. <u>Directed Verdict on "Crime of Violence" Issue</u>

Jefferson tells us a "crime of violence" is "an essential conduct element" of § 924(c), *see Rosemond v. United States*, 572 U.S. 65, 74 (2014) (quotation marks omitted), which the government is required to prove to the jury beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466, 477, 490 (2000) (other than the fact of a prior

- 5 -

conviction, a defendant is entitled to "a jury determination that he is guilty of every element of the crime with which he is charged beyond a reasonable doubt" (quotation marks omitted)). We rejected that very argument in *United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014).

In *Morgan*, co-defendant Ford was indicted with (1) kidnapping, (2) conspiracy to commit kidnapping, and (3) use of a firearm during a crime of violence under § 924(c). *Id*. at 1030. For purposes of the § 924(c) count, the judge instructed the jury, "kidnapping [and] conspiracy to kidnap . . . are crimes of violence." *Id*. at 1034 (quotation marks omitted). Like Jefferson in this case, Ford argued "crime of violence" is an element of § 924(c) which the prosecutor is required to prove to the jury beyond a reasonable doubt. *Id*. at 1032. We saw it differently. "Whether a crime fits the § 924(c) definition of a 'crime of violence' . . . requires examination of the legal elements of the crime, not an exploration of the underlying facts." *Id*. at 1034. As a result, it is a "question of law" for the judge, not the jury. *Id*. at 1034-35. *Morgan* is well-reasoned and persuasive but even if it were not, we are bound by its holding. *See United States v. Springer*, 875 F.3d 968, 975 (10th Cir. 2017) (under the "principles of horizontal stare decisis," we are bound by published opinions of prior panels "absent en banc reconsideration or a superseding contrary decision by the Supreme Court" (quotation marks omitted)).

Jefferson acknowledges *Morgan* but argues we may not follow it because it effectively overrules *Apprendi* and *Rosemond*. *See United States v. Mirabal*, 876 F.3d

1029, 1039 (10th Cir. 2017) ("[W]e cannot overrule a Supreme Court opinion."). But *Morgan* did no such thing. Neither *Apprendi* nor *Rosemond* spoke to whether a judge or a jury is to decide whether an offense is a "crime of violence." Rather, as used in this case, *Apprendi* stands for the unremarkable proposition that a criminal defendant is entitled to "a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." 530 U.S. at 477 (quotation marks omitted). And, in *Rosemond*, the Supreme Court addressed what the government must show to convict a defendant of aiding and abetting a § 924(c) offense. 572 U.S. at 67. In doing so, it stated the commission of a violent crime is an essential element of § 924(c). *Id*. at 74. It did not, however, assign to the jury the task of determining whether an offense satisfies the "crime of violence" definition of § 924(c)(3)(A).

Actually, *Morgan* is consistent with Supreme Court precedent. In *United States v. Taylor*, the Supreme Court made the categorical approach applicable in deciding whether an offense qualifies as a "violent felony" under the ACCA. 495 U.S. 575, 600 (1990). We have applied the same approach in deciding whether a crime qualifies as a "crime of violence" under § 924(c)(3). *United States v. Serafin*, 562 F.3d 1105, 1107 (10th Cir. 2009); *see also United States v. Munro*, 394 F.3d 865, 870 (10th Cir. 2005). Using the categorical approach, we focus solely on the statute of conviction, "while ignoring the particular facts of the case," to decide whether it satisfies the "crime of violence" definition. *See Mathis v. United States*, --- U.S. ---, 136 S. Ct. 2243, 2248 (2016); *see also Taylor*, 495 U.S. at 600. In other words, deciding whether a crime is a "crime of

violence" under § 924(c) is largely a matter of statutory interpretation, a legal task for the judge, not a factual one for the jury. *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) (courts are charged with construing statutes); *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

The judge was not obliged and, in fact, ought never submit the "crime of violence" issue to the jury. We now consider whether Hobbs Act robbery is a "crime of violence" under § 924(c)(3)(A).

## 2. Hobbs Act Robbery—Crime of Violence

Jefferson argues Hobbs Act robbery is not a "crime of violence" under § 924(c)(3)(A) because force is a <u>means</u> of committing the crime, not an <u>element</u> of the crime. But in *United States v. Melgar-Cabrera*, we decided Hobbs Act robbery is categorically a "crime of violence" under § 924(c)(3)(A)'s elements clause because the clause requires the use of violent force, i.e., force capable of causing physical pain or injury to another person, and the force element in Hobbs Act robbery can be satisfied only by violent force. 892 F.3d 1053, 1064-65 (10th Cir. 2018).[4]

Jefferson acknowledges *Melgar-Cabrera*, yet says we can ignore it because it did

---

[4] Other circuits have concluded the same. *See, e.g., United States v. Garcia-Ortiz*, 904 F.3d 102, 109 (1st Cir. 2018); *United States v. Hill*, 890 F.3d 51, 56-59 (2d Cir. 2018); *Diaz v. United States*, 863 F.3d 781, 783–84 (8th Cir. 2017); *United States v. Gooch*, 850 F.3d 285, 291-92 (6th Cir. 2017); *United States v. Rivera*, 847 F.3d 847, 848-49 (7th Cir. 2017); *In re Fleur*, 824 F.3d 1337, 1340-41 (11th Cir. 2016).

not address his "elements versus means" argument, but rather assumed Hobbs Act

robbery has a force <u>element</u>.  Even if we were of a mind to, we are not at liberty to ignore

*Melgar-Cabrera*.  It remains the law of this Circuit "absent en banc reconsideration or a

superseding contrary decision by the Supreme Court," neither of which has occurred

here.  *See Springer*, 875 F.3d at 975 (quotation marks omitted).  In any event, his

"elements versus means" argument does not help him.

In a Hobbs Act robbery, the government must prove: (1) "the taking of property

from another against that person's will"; (2) "the use of actual or threatened force,

violence or fear of injury"; and (3) "the conduct obstructed, delayed, interfered with or

affected commerce."  *United States v. Wiseman*, 172 F.3d 1196, 1215 (10th Cir. 1999)

(quotation marks omitted), *abrogated on other grounds by Rosemond v. United States*,

572 U.S. 65 (2014); *see also* 18 U.S.C. § 1951(a), (b)(1); 10th Cir. Crim. Pattern Jury

Instruction No. 2.70.  Jefferson insists the alternatives listed in the second element—(1)

actual or threatened force, (2) violence, and (3) fear of injury—are various means of

committing the second element, not themselves elements.  Because they are means, not

elements, he says Hobbs Act robbery cannot satisfy § 924(c)(3)'s elements clause.  We

agree the statutory alternatives are means,[5] but our agreement ends there.

---

[5] "Elements are the constituent parts of a crime's legal definition—the things . . . the jury must find beyond a reasonable doubt to convict the defendant [at trial] . . . and what the defendant necessarily admits when he pleads guilty." *Mathis*, 136 S. Ct. at 2248 (citations and quotation marks omitted).  Means, on the other hand, are "various factual ways of committing some component of the offense [and] a jury need not find (or a defendant admit) any particular item." *Id*. at 2249.  In making the determination of

When faced with an alternatively phrased statute like § 1951(a), (b)(1), we must decide whether the alternatives are elements or means. *Mathis*, 136 S. Ct. at 2256. But concluding some alternatives are means, not elements, does not end the inquiry as to whether a statute "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Rather, the determination is important only in deciding whether to apply the pure categorical approach or the modified categorical approach. *Id*. at 2256; *see also United States v. Rivera*, 847 F.3d 847, 849 (7th Cir. 2017) ("Contrary to Rivera's belief, the [Supreme] Court [in *Mathis*] did not distinguish between means and elements to dictate which parts of a statute matter in a

---

whether statutory alternatives are elements or means, *Mathis* gives us several tools. First, a "court decision [may] definitely answer[] the question." *Id*. at 2256. Second, "the statute on its face may resolve the issue"—"If statutory alternatives carry different punishments, then under *Apprendi* they must be elements. Conversely, if a statutory list is drafted to offer illustrative examples, then it includes only a crime's means of commission." *Id*. (citations and quotation marks omitted). Finally, if the case law and statute "fail[] to provide clear answers," we can "peek at" the record "for the sole and limited purpose" of answering the elements versus means conundrum. *Id*. at 2256 (quotation marks omitted).

In this case, the language of § 1951(a), (b)(1) and the case law interpreting it suggest "actual or threatened use of force, or violence, or fear of injury" are means, not elements. *See* 18 U.S.C. § 1951(b)(1) ("*by means of* actual or threatened force, or violence, or fear of injury" (emphasis added)); *Wiseman*, 172 F.3d at 1215 (approving jury instruction that Hobbs Act robbery "require[s] proof of *three elements*: first, the taking of property from another against that person's will; *second, the use of actual or threatened force, violence, or fear of injury*; and third, that the conduct obstructed, delayed, interfered with or affected interstate commerce." (emphasis added) (quotation marks omitted)). Moreover, taking a peek at the indictment and jury instructions in this case reveals they reiterate all of the statutory alternatives, which "is as clear an indication as any that each alternative is only a possible means of commission, not an element that the prosecutor must prove to a jury beyond a reasonable doubt." *Mathis*, 136 S. Ct. at 2257.

- 10 -

predicate-offense analysis. The Court instead made this distinction to explain when it is appropriate to use the categorical approach versus a modified categorical approach—an issue that is irrelevant here." (quotation marks omitted)).

Because the statutory alternatives in this case are means, the pure categorical approach applies.[6] Looking only to the statute of conviction, § 1951(a), (b)(1), we "ask whether it can be violated without the use, attempted use, or threatened use of physical force." *United States v. Degeare*, 884 F.3d 1241, 1246 (10th Cir. 2018) (quotation marks omitted). If so, then a conviction under the statute will not satisfy § 924(c)'s elements clause. *Id*. And, whether the statute reaches conduct not satisfying the elements clause depends upon whether each of the means in the second element—actual or threatened force, or violence, or fear of injury—can be satisfied without the use, threatened use, or attempted use of force. *See United States v. Higley*, 726 F. App'x 715, 717 (10th Cir. 2010) (unpublished) (although federal bank robbery can be committed by "force and violence" or by "intimidation," "[t]he critical point is . . . these alternative means of committing bank robbery each have an element [involving] 'the use, attempted use, or threatened use of physical force,' and are therefore crimes of violence as defined in § 924(c)(3)(A)"); *see also Rivera*, 847 F.3d at 849 ("The distinction between means and

_____

[6] In contrast, if statutory alternatives are elements, the modified categorical approach applies and a court can look "to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *See Mathis*, 136 S. Ct. at 2249. It can then decide whether the crime satisfies the "crime of violence" definition.

elements would matter only if one of the ways to commit Hobbs Act robbery, say, putting another in fear of injury, did not involve force, so that a juror could find a defendant guilty irrespective of whether he used force to commit the crime."). Stated differently, "we look to the least of the acts criminalized" by § 1951(a), (b)(1) to decide whether it "reaches any conduct that does not" satisfy § 924(c)'s elements clause. *United States v. Hammons*, 862 F.3d 1052, 1054 (10th Cir. 2017) (citing *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013)); *see also United States v. Harris*, 844 F.3d 1260, 1266, 1268 & n.2 (10th Cir. 2017) (because Colorado's robbery statute sets forth alternative means of committing robbery, i.e., "force, threats, *or* intimidation," we focus on the least culpable conduct—robbery by threats or intimidation—and decide whether it satisfies the ACCA's elements clause (quotation marks omitted)).

While his argument is not a model of clarity,[7] Jefferson appears to suggest the taking of property via "fear of injury" does not involve physical force and therefore Hobbs Act robbery does not contain a force element. He faces an uphill battle. In *Melgar-Cabrera*, we rejected the argument that Hobbs Act robbery does not have as an element the use, threatened use, or attempted use of physical force because it can be committed by causing the victim to part with his property due to "fear of injury," which

---

[7] In his opening brief and Rule 28(j) letter, Jefferson argues the mere fact "actual or threatened force, or violence, or fear of injury" are various means of committing Hobbs Act robbery, not elements, ends the inquiry. Yet, he also criticizes cases deciding that the taking of property by "fear of injury" satisfies § 924(c)'s elements clause because it requires the threatened use of physical force.

can include placing the victim "in fear of injury by threatening the indirect application of physical force." 892 F.3d at 1065-66 (quotation marks omitted). In doing so, we favorably cited *United States v. Hill*, 832 F.3d 135, 140-44 (2d Cir. 2016), for the proposition that placing one in "fear of injury" requires "the threatened use of physical force." *Id*. at 1066 (quotation marks omitted).

Jefferson balks. He tells us to interpret the phrase "fear of injury" as requiring the "threatened use of physical force" would render the phrase impermissibly superfluous because the statute already prohibits taking property from the victim against his will via "threatened force." *See Loughrin v. United States*, 573 U.S. 351, 357 (2014) (words or phrases joined by the word "or" should not be construed as having the same meaning). He is too ambitious.

Assuming substantial overlap between the two phrases, such overlap is not "uncommon in criminal statutes." *Id*. at 358 n.4. It's especially true when Congress sets forth various factual means of violating a statute. *See*, *e.g.*, 18 U.S.C. § 1462 (prohibiting the importation or transportation in interstate commerce of, *inter alia*, "any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character"); 18 U.S.C. § 1519 ("Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter . . . shall be fined under this title, imprisoned not more than 20 years, or both.").

- 13 -

Moreover, the canon of statutory construction requiring terms connected by a disjunctive be given separate meanings is not absolute; "context [can] dictate" a different result. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). In this case, § 1951(a), (b)(1) prohibits bank robbery by "threatened force," which overlaps with robbery by "fear of injury." However, it also prohibits robbery by "actual . . . force," which overlaps with robbery by "violence." *See* https://www.merriam-webster.com/dictionary/violence (defining "violence" as, among other things, "*the use of physical force* so as to injure, abuse, damage, or destroy" (emphasis added)). Taken in context, one thing is clear: Congress sought to prohibit the taking of property from a victim against his will by actual or threatened use of physical force. That satisfies § 924(c)(3)(A).

B. *Hobbs Act Robbery Jury Instructions—Counts 1-3, 5, and 7*

Jefferson's proposed instructions on the robbery counts would require the jury to decide whether they were committed by (1) "force—actual or threatened—or violence against [the store clerk's] person" or (2) "fear of injury—immediate or future—to [the store clerk's] person." (R. Vol. 1 at 182-84, 186, 188.) If the jury were to find they were committed by the actual or threatened use of force, the proposal would then instruct the jury to decide "whether the force used or threatened was force capable of causing physical pain or injury to another person or the person's property." (*Id*.) The judge refused those instructions; he instead told the jury the government had to prove beyond a reasonable doubt, *inter alia*, Jefferson took or obtained property "by wrongful use of actual or threatened force, violence, or fear." (*Id*. at 247-51.) He further instructed:

"Robbery is the unlawful taking of personal property from another against his or her will. This is done by threatening or actually using force, violence, or fear of injury, immediately or in the future, to person or property." (*Id*. at 252.)

Jefferson says the jury should have been told that "force" in Hobbs Act robbery means "violent force." The government agrees and so do we.[8] In *Melgar-Cabrera* and *Thomas*, we held Hobbs Act robbery requires violent force, as that term was defined in *Johnson I*. *Melgar-Cabrera*, 892 F.3d at 1064-65; *United States v. Thomas*, 849 F.3d 906, 909 (10th Cir. 2017). In other words, the government must show the defendant used or threatened "'force capable of causing physical pain or injury to another person.'" *Thomas*, 849 F.3d at 909 (quoting *Johnson I*, 559 U.S. at 140). "This requires more than the 'slightest offensive touching' . . . but may 'consist of only the degree of force necessary to inflict pain—a slap in the face, for example.'" *Id.* at 909 (quoting *Johnson I*, 559 U.S. at 139, 143). Because this case is on direct review, *Melgar-Cabrera* and *Thomas* apply. *See Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987).

The government's admission of error leaves it to show the error was harmless beyond a reasonable doubt. *See United States v. Sierra–Ledesma*, 645 F.3d 1213, 1217 (10th Cir. 2011) ("An instruction that omits an element of the offense . . . does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for

---

[8] In its brief, the government was equivocal as to whether the judge's Hobbs Act robbery instructions were error. When pressed at oral argument, however, it admitted error but claimed it to be harmless.

determining guilt or innocence. Therefore, when a defendant protests the omission of an element at trial and on appeal, we must decide whether that error is harmless, that is, whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (citation and quotation marks omitted)). The government claims the evidence provided exactly that—uncontroverted proof of "violent force" being used in each robbery. We agree. "On the facts of this case, . . . the district court's error worked no reversible harm." *Id.* at 1224.

During the first robbery on December 30, 2014, Jefferson and his accomplice arrived at the Fast Trip store in a white Dodge Caravan, which they stole the previous day.[9] In the course of that robbery, Jefferson hit the store clerk "hard" on the left side of the head causing swelling for several days. (R. Vol. 2 at 540.) That is "violent force" because it was not only capable of causing physical pain or injury but did, in fact, cause injury. *See Johnson I*, 559 U.S. at 143 (identifying "a slap in the face" as conduct rising to the level of violent force); *see also Castleman v. United States*, 572 U.S. 157, 182 (2014) (Scalia, J., concurring) ("hitting, slapping, shoving, grabbing, pinching, biting, and hair pulling" are all "capable of causing physical pain or injury" (quotation marks omitted)).[10]

---

[9] No direct evidence implicated Jefferson and his accomplice as the individuals who stole the van but an abundance of circumstantial evidence did: the van's owner testified it was stolen the night before the first robbery and the van was later used by Jefferson and his accomplice during the robberies.

[10] "Although a concurring opinion is not binding on us, we may consider it for its persuasive value. *See* Bryan A. Garner, et al., The Law of Judicial Precedent 183 (2016).

- 16 -

During the second robbery on January 1, 2015, Jefferson's accomplice dropped the cash drawer just inside the front door while running out of the store. The store clerk attempted to hold the door shut to safeguard the scattered cash and cash drawer while his co-worker retrieved the key to lock the door. Jefferson and his accomplice returned to the store, "overpowered" the clerk's resistance, opened the door, and swept up the loose cash and drawer from the floor. (R. Vol. 2 at 587.) The surveillance video from the robbery taken from a camera mounted <u>outside</u> the store shows the accomplice pulling at the front door and then Jefferson joining him in order to successfully pry the door open. The video taken from the camera mounted <u>inside</u> the store shows the clerk holding the door with both hands while leaning back with all his weight to prevent Jefferson and his accomplice from opening the door. Such "grabbing" at the front door with the clerk clinging to it in resistance "has the capacity to inflict physical pain, if not concrete physical injury, upon the victim." *See United States v. Garcia*, 877 F.3d 944, 955 (10th Cir. 2017) (quotation marks omitted). The struggle over the door could easily have caused the clerk to fall to the ground, pull a muscle, or suffer other injury; it is "certainly force capable of causing pain or injury." *Id*. That the clerk was not injured is immaterial; *the capacity* to cause physical pain or injury matters. *Id*. (citing *New Mexico v. Verdugo*, 164 P.3d 966, 974 (N.M. Ct. App. 2007) (defendant's jerking at victim's purse attached

---

We find Justice Scalia's concurrence in *Castleman* persuasive on the quantum of force required to constitute 'violent' force." *United States v. Garcia*, 877 F.3d 944, 950 n.4 (10th Cir. 2017).

- 17 -

to her arm while defendant is driving a car is "certainly capable of causing physical pain or injury to the victim"), and *New Mexico v. Segura*, 472 P.2d 387, 387-88 (N.M. Ct. App. 1970) (grabbing a shopping bag from victim and pulling it away so hard as to cause the victim to fall to the ground "is certainly force capable of causing pain or injury")); *see also United States v. Jennings*, 860 F.3d 450, 456-57 (7th Cir. 2017) (citing "snatching gold chains from victim's neck, leaving scratches," "push[ing] a victim against a wall and tak[ing] his wallet" and "running up to and pounding on window of victim's car" as examples of violent force; although "these instances of force might result in minor injuries, such as scratches or reddened skin, or none at all," they "qualify as violent force [because] they have the capacity to inflict physical pain, if not concrete physical injury, upon the victim").

During the third robbery on January 4, 2015, the clerk, who was aware of the first two robberies, including the use of a white Dodge Caravan, became "scared" when he saw a similar van pull into the store's parking lot. (R. Vol. 2 at 627.) He unsuccessfully tried to hold the door to prevent Jefferson and his accomplice from entering the store. Once inside the store, Jefferson told the clerk he had a gun while lifting his shirt to reveal the handle of weapon. Although the store clerk testified to Jefferson having a weapon, the surveillance videos (which did not contain audio) did not capture it. The government relies on the use of a firearm to establish the third robbery involved the threatened use of violent force. But the jury acquitted Jefferson of use or carry of a firearm during the third robbery. *See supra* n.1. While a host of reasons could explain the jury's acquittal,

including reasons unrelated to whether Jefferson actually had a gun, we nevertheless cannot confidently say the government proved beyond a reasonable doubt the third robbery involved violent force based on the use of a gun. But there is more. The surveillance videos reveal Jefferson and his accomplice in a "tug-of-war" with the store clerk over the door. Like the second robbery, the struggle with the clerk at the door could have caused injury to the clerk. The third robbery also involved force capable of causing physical pain or injury.

The fourth and fifth robberies (both on January 9, 2015) also involved firearms.[11] During the fourth robbery (Fast Stop), the clerk testified Jefferson and Lolar pointed their guns at his face from a short distance away and the surveillance video supports his testimony. He also testified to Lolar threatening to shoot him and there was no evidence to the contrary. During the fifth robbery (7-Eleven), the clerk was not available to testify but the surveillance videos and the still images derived from them show Jefferson holding a "gun" close to the clerk's head and then to his chest. It is hard to imagine a more obvious threatened use of violent force. *United States v. Maldonado-Palma*, 839 F.3d 1244, 1250 (10th Cir. 2016) ("Employing a weapon that is capable of producing death or great bodily harm . . . necessarily threatens the use of physical force, i.e., force capable of

---

[11] Unlike the third robbery, the jury convicted Jefferson of use or carry of a firearm during the fourth and fifth robberies (Counts 6 and 8). While Jefferson tried to persuade the jury he did not use or carry an actual firearm during those robberies, the jury did not buy it. Jefferson does not contest the sufficiency of the evidence on those counts, only other errors which we have discussed.

causing physical pain or injury to another person" (quotation marks omitted)).

The instructional error was harmless beyond a reasonable doubt.

C.  *Government's Closing Rebuttal Argument*

The government did not introduce the guns used in the two January 9 robberies.  It did, however, present the surveillance videos and still images derived from them.  Those videos and images show Jefferson and Lolar brandishing "guns" during those robberies.  The government also presented testimony from Lloyd Coon, the store clerk present during the January 9 robbery of the Fast Stop.[12]  He claimed to be familiar with guns because he "come[s] from a family that likes to hunt a lot" and has personally shot at least six different types of guns throughout his lifetime (he was 50 at the time of trial) and attended numerous gun shows.  (R. Vol. 2 at 715.)  He was looking down at a computer when Jefferson and Lolar entered the store.  He looked up when he heard two guns being cocked by pulling the slide back.  When he did so, Jefferson and Lolar had their weapons pointed at his face.  One gun was black and one was silver.  Both were made of metal.  Based on the distinctive sound made when the weapons were cocked, he concluded they were semi-automatic pistols.[13]  He believed them to be real firearms, not BB guns, because of the diameter of the openings in their barrels.  The diameter of a BB gun's

---

[12] As alluded to previously, the store clerk working at the 7-Eleven store when it was robbed on January 9 was not available to testify.

[13] Pulling the slide back on a semi-automatic pistol (1) ejects any round or empty casing in the chamber, (2) cocks the hammer, and (3) strips a new round from the magazine and inserts it into the chamber.

opening is "itty bitty"; the barrel openings of the guns pointed at him were larger than a BB gun and were consistent with a 9 mm (.35 inches) or .45 caliber (.45 inches). (*Id*. at 757.) Although he once owned a BB gun with a slide, it was spring-loaded and made a "clunky sound" when the slide was pushed forward. (*Id*. at 763.) The guns used in this case, in contrast, made a "smooth sound and a high pitched click" when cocked. (*Id*.) In addition to this detailed knowledge, he said he considered the weapons to be actual firearms when Lolar threatened to shoot him. He was "reasonably certain . . . [they] were real firearms." (*Id*. at 765.)

On cross-examination, he acknowledged having told a detective on the night of the robbery he heard only one gun being cocked and the guns may have been BB guns because one of them had a silver ring at the end of its barrel (yet he later testified he had never seen a BB gun with a silver ring). He did say some BB guns and pellet guns resemble actual firearms, including BB guns cocked by pulling the slide back. His testimony set the stage for the alleged prosecutorial misconduct.

During closing argument, the prosecutor recounted the evidence establishing Jefferson to have brandished an actual firearm (not a fake gun, toy gun, or BB gun) during the January 9 robberies. For his part, defense counsel argued the government had not established, beyond a reasonable doubt, the weapon to be an actual firearm, which requires one to focus not on its looks but its operation, i.e., whether it will expel a projectile via an explosion. *See* 18 U.S.C. § 921(a)(3) (defining "firearm" as "any weapon . . . which will or is designed to or may readily be converted to expel a projectile

- 21 -

by the action of an explosive"). He emphasized the government's failure to produce the weapons, a BB gun's resemblance to a real firearm, and Coon's initial statement to the police. In doing so, he told the jury Coon's testimony was not "dispositive" as to whether the weapons were actual firearms, because he assumed they were real and "rightfully so." (*Id*. at 873.) He suggested proof beyond a reasonable doubt would include a police officer testifying he test-fired, felt, or heard the gun or "the testimony of some other person that they saw the firearm, they heard it even . . . or they smelled the explosive, or there was a casing or a bullet, or not even a bullet, but a bullet hole, or something . . . they could measure it by." (*Id*. at 874.) "But you have nothing near that." (*Id*.) He then stressed to the jury "we don't have to prove anything[;] . . . it's not Mr. Jefferson's burden to prove himself innocent. [The government] bring[s] these charges. [It has] to prove every element of every offense beyond a reasonable doubt, not just lump them together because you're mad, and you feel like he's a bad guy. It's their burden." (*Id*. at 875.)

In rebuttal, the prosecutor began by responding to defense counsel's argument that detailed evidence, not merely superficial appearance, was necessary to prove Jefferson used an actual firearm. She told the jury the government did not need to "have the firearm" in order to satisfy its burden but could instead rely on circumstantial evidence. (*Id*. at 878.) She said "[t]he nature of the weapon can be established in this case by the testimony of the witnesses along with all the other evidence, including the Facebook, including the videos." (*Id*.) She went on: "The possibility that the gun is fake is not

- 22 -

something that [the government has] to overcome.  Possibilities do not equate to reasonable doubt." (*Id*.)  Defense counsel objected.

At side-bar, he explained: "She's saying [the government doesn't] have to . . . disprove . . . the possibility . . . these were not real firearms, and in fact, there has been testimony . . . they aren't, and so, when she says that, [it] is burden shifting." (*Id*. at 878.) The prosecutor defended herself, claiming the statements were legally correct: "[The government does not] have to . . . disprove possibilities.  That does not equate to reasonable doubt . . . .  [T]he possibility . . . the gun is fake does not establish reasonable doubt . . . ." (*Id*. at 879.)  The judge overruled the objection, concluding "there's a basis in the law for [the prosecutor] to make the argument . . . at this time." (*Id*.)

Returning to the jury, the prosecutor continued:

> [W]e do not have to disprove theoretical possibilities that a gun is fake or not real.  What we do have to prove is . . . it was firearm, and you heard that from a variety of sources. You heard it from Detective Rice when he said . . . it was a pistol or a firearm or a gun or that you saw it on the video.  You get to use your common experience, your common sense, and your good judgment to draw reasonable inferences.  Is it possible it could have been a fake or toy gun?  Might it have been a fake or toy gun?  But that's not the burden. The burden is . . . we only have to prove beyond a reasonable doubt those elements.

(*Id*. at 879-80.)  She finished by asking "[D]o you really truly believe [Jefferson is] going to bring a toy or fake gun there?" (*Id*. at 880.)

Jefferson argues the prosecutor's rebuttal closing argument improperly shifted the burden of proof to him.  He says the prosecutor's statements to the jury—"the possibility that the gun is fake is not something that [the government has] to overcome" and "possibilities do not equate to reasonable doubt"—were improper because the Tenth

Circuit's criminal pattern jury instructions make clear a jury should not convict if "'there is a real possibility that the defendant is not guilty.'" (Appellant's Op. Br. at 36-37 (quoting 10th Cir. Pattern Jury Instruction 1.05).) Moreover, "the Supreme Court has made clear . . . only 'fanciful' and 'imaginary' possibilities, or possibilities based on 'fanciful conjecture' do not amount to reasonable doubt." (*Id*. at 37 (quoting *Victor v. Nebraska*, 511 U.S. 1, 17, 20 (1994)).) In this case, Jefferson tells us, there was a real possibility, not merely a fanciful one, the "guns" displayed were not actual firearms: Coon told an officer after the robbery he thought the guns may have been BB guns. And, contrary to the prosecutor's rebuttal closing argument, the government had the burden to overcome that possibility.

"We review allegations of prosecutorial misconduct de novo." *Sierra-Ledesma*, 645 F.3d at 1227; *see also United States v. Anaya*, 727 F.3d 1043, 1052 (10th Cir. 2013) ("When [as here] the defendant objects at trial based on prosecutorial misconduct and the district court overrules the objection, we conduct a de novo review for error."). "In conducting [our] review, we first decide whether the conduct was improper and then, if so, whether the Government has demonstrated that error was harmless beyond a reasonable doubt."[14] *Sierra-Ledesma*, 645 F.3d at 1227.

---

[14] Jefferson says harmless error review has no place here: Because the judge overruled his objection to the prosecutor's improper statements regarding reasonable doubt, he placed the court's imprimatur on those statements. As a result, the error is structural and harmless error does not apply. He relies primarily on *Sullivan v. Louisiana*, 508 U.S. 275 (1993).

In *Sullivan*, the judge provided jury instructions equating reasonable doubt with

"We will not overturn a conviction on account of improper argument by the prosecutor unless the prosecutor's misconduct was enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented." *United States v. Oberle*, 136 F.3d 1414, 1421 (10th Cir. 1998) (quotation marks omitted). "In so deciding, we do not consider the prosecutor's remarks in a vacuum." *United Sates v. McBride*, 656 F. App'x 416, 422 (10th Cir. 2016) (unpublished). Rather, "we consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." *Id*. (quotation marks omitted); *see also Sierra-Ledesma*, 645 F.3d at 1227 ("To determine whether prosecutorial misconduct is harmless, we must look to the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." (quotation marks omitted)). Factors relevant to determining whether a prosecutor's argument deprived the defendant of fair trial include "whether the instance was singular and isolated, whether the district court instructed the jury that the attorneys'

---

"grave uncertainty" and "substantial doubt;" such instructions had previously been found to be improper because they "suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Id.* at 277; *Cage v. Louisiana*, 498 U.S. 39, 41 (1990). The *Sullivan* Court decided instructions misstating the reasonable doubt standard are "structural defects in the constitution of the trial mechanism, which defy analysis by harmless error standards." 508 U.S. at 281 (quotation marks omitted).

     *Sullivan* is inapposite. It involved an improper jury instruction; this case involves the government's closing rebuttal argument. The Supreme Court has not extended *Sullivan* to our context and we decline to do so in this case. *See Bartlett v. Battaglia*, 453 F.3d 796, 801-02 (7th Cir. 2006) (declining to extend *Sullivan* to a prosecutor's misstatements regarding reasonable doubt).

argument was not evidence, and whether there was substantial evidence of the defendant's guilt." *Oberle*, 136 F.3d at 1421. "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Wilson v. Sirmons*, 536 F.3d 1064, 1117 (10th Cir. 2008) (quotation marks omitted).

The challenged statements, while inartful, did not shift the burden of proof from the government to Jefferson, but they may have misstated the law as to the government's burden of proof, i.e., reasonable doubt. The prosecutor essentially told the jury <u>any</u> possibility the gun is fake does not equate to reasonable doubt. But in some of her argument she failed to make the important distinction between "fanciful" or "imaginary" possibilities and "real" possibilities, as called for by *Victor* and 10th Cir. Crim. Pattern Jury Instr. No. 1.05. The alleged error, however, was harmless beyond a reasonable doubt.

The judge instructed the jury: "The lawyers' statements and arguments are not evidence." (R. Vol. 1 at 232.) He also told the jury prior to closing arguments "[t]he government has the burden of proving [Jefferson] guilty beyond a reasonable doubt" and Jefferson did not have "to prove his innocence." (R. Vol. 1 at 240.) He also <u>correctly</u> instructed the jury "[i]f . . . you think there is a real possibility that [Jefferson] is not guilty, you must give him the benefit of the doubt and find him not guilty." (*Id*.) And he reminded the jury of the government's burden after closing arguments and before it retreated to the jury room for deliberations. The jury was told to follow the instructions and we assume it did because there is no reason to think otherwise. *See United States v.*

*Urbano*, 563 F.3d 1150, 1155 (10th Cir. 2009) ("This court generally assumes jurors follow jury instructions."). Its acquittal on Count 4 demonstrates its ability to weigh the evidence and apply the law as to each count. *See supra* n.1.

Second, the extent of the misconduct was minimal. The challenged statements constituted only two sentences of the government's lengthy closing argument and a 4-day trial. *See Sierra-Ledesma*, 645 F.3d at 1227.

Third, the role of the misconduct was negligible. The prosecutor made the alleged offending remarks in response to defense counsel's suggestion that anything less than admission of the actual firearm or proof the firearm was test-fired or felt was not enough to satisfy the government's burden. She correctly responded the government did not need either to satisfy its burden; the nature of the weapon could be established by the testimony of the witnesses, the Facebook post, and the videos. And while she may have arguably misstated the law, she later corrected herself: "[W]e do not have to disprove *theoretical* possibilities that a gun is fake or not real." (R. Vol. 2 at 879-80 (emphasis added).) She also reiterated the government's burden to prove beyond a reasonable doubt that the weapon used was an actual firearm.

Finally, but importantly, the evidence of guilt was substantial. Jefferson did not dispute to having participated in all five robberies. The only issue was whether he possessed an actual firearm during the last two robberies. The surveillance videos show Jefferson and Lolar armed with guns during those robberies, as well as the manner in which they handled them, which strongly suggests they were actual firearms. Coon

testified to his belief the guns were real based on the size of their barrels and the sound they made when cocked. Not only that, Coon told the jury Lolar threatened to shoot him. And the jury was provided a screenshot of Jefferson's Facebook post made after the January 9 robberies, which included a firearm emoji.

Admittedly, Coon told a detective the night of the robbery he thought the guns might be BB guns. But he did so because one of the weapons had a silver ring around it. Yet, he conceded he had never seen a BB gun with a silver ring. Moreover, because Jefferson was charged not only with the substantive § 924(c) offenses but also aiding and abetting those offenses, the jury could find Jefferson guilty of the § 924(c) counts even in the (unlikely) event he possessed a BB gun (the one with the silver ring) and Lolar possessed an actual firearm. *See Rosemond*, 572 U.S. at 74-78 (holding (1) a defendant's active participation in the underlying violent crime is sufficient to establish the affirmative act requirement of aiding and abetting liability and (2) defendant's advance knowledge his confederate would be armed satisfies the intent requirement).

We trust that the properly-instructed jury acted upon the evidence and was not misled by the prosecutor's stray remarks.

**AFFIRMED**.